(120 App. Div. 357)

### PICKETT v. MICHAELS.

(Supreme Court, Appellate Division, First Department. June 28, 1907.)

1. SPECIFIC PERFORMANCE—ORAL CONTRACT—NECESSITY FOR CLEAR PROOF.

The remedy of specific performance of oral contracts rests largely in the sound discretion of the court, and should be granted only where the contract is fully established, and, while the matter rests primarily with the trial court, it is within the cognizance of the Supreme Court, and hence that court must be satisfied that the plaintiff has established his right to equitable relief before the judgment is made conclusive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 17, 18, 388.]

2. SAME—EVIDENCE.

A judgment directing the specific performance of an oral contract to deliver corporate stock in exchange for services must be reversed where it was based on alleged admissions by defendant shown by a purported stenographic report of a conversation between the parties, and either such report was not true or plaintiff's version of the conversation was not correctly given, the circumstances tending to discredit the alleged admissions as evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 388, 389.]

Patterson, P. J., and Houghton, J., dissenting.

Appeal from Special Term, New York County.

Suit by H. Clay Pickett against Jacob Michaels. Defendant appeals from a judgment for plaintiff directing the specific performance of an oral contract. Reversed and new trial granted.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAMBERT, LAUGHLIN, and HOUGHTON, JJ.

I. Henry Harris, for appellant.
John S. Wise, Jr., for respondent.

LAMBERT, J. The remedy of specific performance of oral contracts, resting, as it does largely, in the sound discretion of the court (McPherson v. Schade, 149 N. Y. 16, 43 N. E. 527; Matter of Argus Co., 138 N. Y. 572, 573, 34 N. E. 388; Dunckel v. Dunckel, 141 N. Y. 434, 36 N. E. 405) is one which should not be permitted except in those cases in which the contract is fully established, and, while the matter rests primarily with the trial court, it is yet within the cognizance of the Supreme Court, and hence we must be satisfied that the plaintiff has established his right to equitable relief before the judgment is made conclusive. (Matter of Adler, 60 Hun, 481, 483, 15 N. Y. Supp. 227). "The rule which courts of equity have adopted in suits

for the specific performance of contracts," say·the court in Lobdell v.
Lobdell, 36 N. Y. 327, 329, "requires that the contract be established
by competent and satisfactory proof, to be clear, definite, and certain,
for the reason, as Judge Story expresses it, that a court of equity 'ought
not to act upon conjectures,' and if the proof should end in leaving
the contract uncertain, so that the court cannot say what its precise
import and limitations are, a decree of specific performance will be
withheld." This rule in its application depends upon the evidence.
If there is evidence in this case tending to establish a definite con-
tract, then it is within the power of the court to award specific per-
formance. ' But the evidence, and its sufficiency, are open to review in
this court, and upon appeal we must be satisfied that the facts are such
as to warrant the relief granted.

The complaint alleges that during the month of August, 1901, plain-
tiff was in the employ of the defendant, engaged in the business of
trading in sea food; that previous to said date plaintiff had entered
into a contract and agreement of employment with defendant, part of
which was that, from and after the 1st of September, 1901, plaintiff
was to receive, as compensation for his services, one-third of the net
profits thereof; that at a price to be paid by plaintiff to defendant, to
be determined as soon as plaintiff and defendant could ascertain the
value of the stock, fixtures, and accounts collectible of the defendant's
said business, plaintiff was to purchase of said defendant one-third in-
terest in defendant's business, and become a partner in said business;
that at that time H. T. Darling and George E. Conley were in the
same line of business; that they contemplated dissolving partnership,
and that Conley intended to continue in business as a rival of the de-
fendant; that plaintiff was contemplating severing his business rela-
tions with defendant and making other arrangements; that in the
month of August the plaintiff and defendant entered into a new con-
tract, whereby plaintiff was to endeavor to induce the said George E.
Conley to combine with defendant and form a corporation for the
conduct of a joint business; that Conley was an enemy of defendant;
that it was a part of the agreement that the plaintiff should release his
claim to an interest in the profits of the business of defendant and his
right to become a partner therein, and to continue his business con-
nection with the defendant, and to use his utmost endeavors to in-
duce Conley to join in the formation of a corporation, and that in
consideration of these things the defendant agreed that the plaintiff
should have 20 per cent. of the capital stock of the proposed corpora-
tion; that the plaintiff did surrender such interest in the profits of the
business, etc., and exerted himself to bring about the creation of the
corporation, and that he did bring Conley and the defendant together,
resulting in the formation of such corporation in the month of August,
1901; that 45 per cent. of the stock of such corporation was issued to
the defendant, and that $2,000 additional of the stock was issued to
defendant's wife, in payment of the defendant's contribution of capital
to the corporation; that the business has been carried on, and that
the defendant thus became obligated ·to deliver to the plaintiff 20 per
cent. of such stock. There are other allegations going to the question

of equitable jurisdiction, the right of the plaintiff to share in the dividends, etc., but none of these are essential to the determination of the question of whether the plaintiff has established his contract with sufficient certainty and definiteness to entitle him to a decree for specific performance of the same.

The learned justice before whom this action was tried has written a brief opinion which clearly indicates that, except for the testimony of a single witness, the case would have been differently disposed of, and it is important, therefore, to consider the question from this standpoint. If the evidence of this one witness is inherently improbable, or if it is not in harmony with the plaintiff's own version of the facts, or if it is open to such suspicion that in good conscience we cannot say that the defendant is fairly charged with the obligations imposed by the judgment, the propriety of a new trial will become apparent. The opinion of the court at Special Term reads as follows:

"The claim of the plaintiff rests upon an alleged oral agreement neither so overprobable in itself nor so supported by likelihood in the circumstances narrated as its inducement as to disturb the balance of flat contradiction. The admissions made by the defendant, however, at a meeting with the plaintiff, according to the stenographic account of the interview, by one witness without the bias of interest, seem sufficient to sustain the judgment which is awarded to the plaintiff."

That is, the defendant denies the making of the contract alleged, and there is nothing in the evidence as given by the plaintiff to overcome this denial, except as it may be found in the evidence of a young woman who claims to have taken a stenographic report of a conversation between the plaintiff and the defendant at the Imperial Hotel. This young woman testified that the plaintiff came to her in the Imperial Hotel and asked if she was a stenographer, and engaged her to go to the parlor and take notes of a conversation; to appear as a guest of the hotel, and avoid letting the defendant know that she was taking the notes. The plaintiff and defendant came into the parlor where she was seated and located within three or four feet of her, and that she took all of the conversation; that she transcribed her minutes immediately afterwards, and, although this had not been requested by the plaintiff, she appended a statement to the effect that she swore to the correctness of the transcript, although the notary treats it as a mere acknowledgment. She testified that the paper was not changed after the plaintiff brought in the notary public; that the paper was signed and sworn to on the same day, immediately following the interview on the 8th day of October, but the acknowledgment before the notary is dated on the 11th day of October. The witness was permitted to read from the alleged transcript of her minutes, and it is interesting to note that, while she swears that she took all the conversation, there are absolutely none of the preliminaries which might be expected to appear. It is to be remembered that the plaintiff and defendant had had a disagreement, that the plaintiff had demanded his stock and had left the defendant in a huff, and that the latter, a successful business man, had a right to expect litigation, yet we are asked to believe that he went to the parlor of the Imperial Hotel with the plaintiff and answered a series of abstract questions,

calculated to embarrass himself in litigation he might have with the plaintiff, and that this was done in the presence of this young woman with a notebook, and that this all occurred without any preliminary explanation, such as is common among men under such circumstances. 'Here is the alleged stenographic report of the interview, as given by the witness:

"Mr. Michaels, at my interview with Mr. George E. Conley in regard to employing me, did you not say you fully intended to give me one-fourth the profits of your business from September 1, 1901; that I would be entitled to the drawing of $50 weekly? A. Yes. Q. Did you not further agree to have stipulated in a new contract that I would have the option of buying one-third of your business on September 1, 1902, value of same to be determined as soon as you could take stock, book accounts, and so forth pertaining to your business, the earliest moment after September 1, 1901? A. I certainly did. Q. Did you not, after your first interview with Mr. George E. Conley, come back to me and say, 'Clay, I told Mr. Conley that under no circumstances would I be willing to form a corporation unless Mr. Pickett would have 20 per cent. of the stock, as I had promised Mr. Pickett one-fourth of the profits in my business, and in lieu of his services and valuable information which he has given me since November of last year up to the present time?' A. Yes, yes; I certainly did. Q. When I consented to surrender my one-fourth promised profits in your business, did you not ask me to call on Mr. Conley, make him a proposition, as follows: That if a stock corporation could be formed, capital stock of $20,000, with George E. Conley president, J. Michaels vice president, and H. C. Pickett secretary and treasurer, you would take 40 per cent. of the stock, Conley 40 per cent., and H. C. Pickett 20 per cent. of the stock, I, Mr. J. Michaels, agreeing to advance $4,000 to Mr. Pickett to pay for this stock, or I to endorse Mr. Pickett's individual note, which, if agreeable to Mr. George E. Conley, would be turned over to the corporation in payment of Mr. Pickett's stock? A. Yes. Q. Did you consider that I was the instrument in forming the corporation now known as George E. Conley Company? A. Yes, yes; it certainly would not have been if you had not said to Mr. Conley what you did, as I was certainly going to give you that 20 per cent. for bringing it about; you can bet on it; and there is no man I would do more for than yourself. Q. Was I not entitled to some consideration, before you took the step you did? A. I had no idea of doing as I did until I got to the lawyer's office."

It is interesting to note that the plaintiff, in speaking of this same conversation in the Imperial Hotel, gives an entirely different version, in so far as he states what occurred. He tells of having the conversation in the hotel in October, 1901, and says that this was the only conversation since that time. He then says that he had stenographic notes taken of the conversation, and that during—

"this conversation I said to Mr. Michaels, 'Don't you think you have treated me very badly in making me lose 17 years of my life?' He said, 'How is that, Pickett?' I said, 'After 17 years I came to work with you expecting to become your partner, promised as such, and now I am thrown out and no stock awarded to me at all.' * * * I said, 'Mr. Michaels, don't you think I have been very badly treated?' He wanted to know why. I told him that after all these years that I have been working up, after all I have done for him, after all the business I had secured, didn't he think he had treated me badly in not giving me that stock as he had promised. He said, 'Pickett, I am sorry, but I could not help it; my lawyers objected to it, and there was nothing else to do.' "

Pressed to state as near as he could his conversation with the defendant at this interview, the plaintiff says:

"The first question put to him was, 'Michaels, don't you think I was treated badly in not receiving that stock?' He said, 'Yes, but my counsel did not think it wise that you should have this stock.' "

The stenographer testifies, as we have already noted, that the first question was entirely different from that stated by the plaintiff, and it is to be noted that the conversation as given by the plaintiff shows the defendant to have made explanatory replies, as men might do in such a conversation, instead of the abrupt answers of "Yes" and "No" as given in the alleged stenographic notes. There is nothing in the conversation, as given by the plaintiff, which constitutes a damaging admission on the part of the defendant; it is only when we come to the stenographic minutes, where the questions are formed with great detail and accuracy, strongly suggestive of the handiwork of a shrewd lawyer, that there is anything in the nature of an admission of the plaintiff's alleged contract, and these alleged minutes do not correspond with the plaintiff's version of the conversation, and the forms of the questions and the answers are not such as would be expected under the circumstances described, nor do they show any of the characteristics which are manifest in the conversation as the plaintiff details it. When we add to this the fact that the young woman who is alleged to have taken these notes, and to have transcribed them and sworn to them on the same day, added a verification to the notes as transcribed, without, as she intimates, any request for such a verification, and that the acknowledgment appears in fact to have been taken three days later, and that the meeting in the hotel, as detailed in the evidence, was brought about for the purpose of producing evidence in support of this highly improbable contract, it seems to us that it is questionable whether the plaintiff's case is materially strengthened by this testimony. Obviously the defendant was tricked into going to the hotel; he was induced to go there for the purpose of making admissions in support of the plaintiff's alleged cause of action, and the opportunities for taking advantage of him, and of producing alleged stenographic reports of his admissions, were so great, and the alleged admissions are so different in many respects from the contract alleged in the complaint and from the testimony of the plaintiff, that a court of equity is hardly justified in accepting this evidence as conclusive, at least without further opportunity for testing the reliability of the witness and all the surrounding circumstances. There is a degree of doubt always attaching to evidence developed through methods such as the plaintiff has adopted in the present instance. The cause of action which he asserts is not calculated to appeal strongly to the conscience of the court; the evidence which the plaintiff himself gives of the alleged contract is by no means certain, and, when he realizes the possibilities of fraud in connection with the methods adopted to gain the alleged admissions, we are of the opinion that the case is lacking in that degree of certainty which should be found in all matters where the court is called upon to decree specific performance. The contract is not, as it might be spelled out from the alleged admissions, the same contract which the plaintiff alleges in his complaint, and, although these might be overlooked as being mere variations in detail, if the case was

otherwise free from doubt, we are of opinion that under all of the circumstances the plaintiff can have no cause for complaint if he is called upon, in a subsequent trial, to establish with greater clearness just what his contract with the defendant is. He is appealing, not to the law side of the court, but to the equitable jurisdiction; he has undertaken to satisfy the conscience of the court that he is entitled to the relief demanded, and this requires that the facts shall be brought out by evidence which is not open to the suspicion of having been manufactured for the purpose. Either the stenographic minutes as read in this case are not true, or the conversation detailed by the plaintiff is not correctly given, and we are of opinion that the version given by the plaintiff has within it greater inherent evidence of truthfulness than that which purports to give the actual conversation, for reasons which have already been pointed out. If the plaintiff's version is true, it gives no support to the cause of action; if it is not true, it opens the door to suspicion as to all of his acts in the matter; and we are constrained, therefore, to reverse the judgment and to award a new trial.

The judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.

McLAUGHLIN and LAUGHLIN, JJ., concur. PATTERSON, P. J., and HOUGHTON, J., dissent.